### SHEELOR v. SMITH, Treasurer.

(First Division.  Juneau.  September 10, 1921.)

No. 2100-A.

**1. Mandamus ⬤➾ 109—Officers—Public Funds.**

Plaintiff was a clerk in the office of the commissioner of public health. She presented vouchers for such services to the commissioner, who approved them in writing, and transmitted them to the Governor, who also approved them in writing and ordered their payment from funds of the territory. They were presented to the secretary of the territory by the Governor, who drew warrants on the treasurer in favor of the claimant, which warrants were then by the Governor and the secretary of the territory presented to the treasurer for his signature and payment. Defendant refused to sign the warrants and canceled them as illegal. Plaintiff brought this suit, asking for a writ of mandamus to require the treasurer "to forthwith sign and deliver to petitioner and register and pay the two warrants above mentioned." *Held*, the law of Alaska does not impose any duty upon the treasurer to pay warrants so issued, but only to pay legal claims, approved by the officer under whose direction the services were performed, and presented to the treasurer by the claimant; and, since the secretary has no authority to draw such warrants, the court has no authority to require the treasurer to pay the two warrants so in controversy. Mandamus denied.

**2. Mandamus ⬤➾ 109—Officers—Public Funds.**

Where a system of drawing warrants for the payment of money from public funds long usually employed was not enjoined by law, but only by custom, and, not being enjoined by law, might be changed at any time, for better or for worse, without laying the officers liable for nonperformance of a duty imposed by law, mandamus will not lie to compel adherence to such a custom.

⬤➾See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

This is an action brought by the plaintiff to obtain a writ of mandamus to be directed to the defendant commanding him to register and pay two certain warrants signed by R. J. Sommers, secretary of the territory, for the sum of $155.85 and $150, respectively. The petition and alternative writ allege that the plaintiff was employed by Dr. L. O. Sloane, the commissioner of public health, to perform certain clerical services for the territory of Alaska in connection with said office during the months of April and May, 1921, and also that during said months she paid out for and on behalf of the territory the sum of $5.85 for the purchase of postage stamps and in payment of official telegrams; that the said services were reasonably worth the sum of $300, and that on May 31st she submitted vouchers for said services, amounting to the sums aforesaid, to the said L. O. Sloane, commissioner of public health of the said territory, for his approval; that said vouchers were approved by him in writing, as required by law, and by the said Sloane transmitted to Thomas Riggs, Jr., Governor of Alaska, and the same were approved in writing by said Governor, as required by law, and payment was ordered by the said Governor from the funds of said territory provided by law for such purposes; that on June 7, 1921, warrants were drawn by the said Sommers, secretary aforesaid, upon the funds of the territory provided by law for the payment of such sums in the manner provided by law; that one of said warrants was in the sum of $155.85, and the other in the sum of $150, and that both of said warrants were signed by said Sommers, secretary as aforesaid, in the manner prescribed by law, and the same were then presented by the said Thomas Riggs, Jr., Governor as aforesaid, and the said R. J. Sommers, secretary as aforesaid, to the said W. G. Smith, treasurer aforesaid, for his signature, as required by law to be affixed to said warrants, and for registration and payment; that thereupon the said Smith, treasurer aforesaid, refused to sign either of said warrants, and still fails, neglects, and refuses to sign the same or either of them, and refused and still refuses to pay same, or register same, or either of them; that it was the duty of the said Smith, treasurer aforesaid, under the law to sign said warrants for the payment of the sums due petitioner, and to register and pay the same whenever the said

vouchers were approved by the said Governor and the warrants drawn and signed by the secretary, as aforesaid.

The prayer is that a writ of mandamus issue commanding Smith "to forthwith sign and deliver to petitioner and register and pay the two warrants above mentioned."

The defendant answered denying the performance by plaintiff of any services for the territory of Alaska, or the payment by her of any expenses for or on behalf of said territory; denying that Dr. Sloane had any authority to employ plaintiff to perform the services or authorize her to incur the said expenses; alleging that no appropriation has been made and no funds are available out of which said claim could be lawfully paid; also alleging that plaintiff has a plain, speedy, and adequate remedy by an action at law on the treasurer's bond; and setting up a great many other things not necessary to be mentioned here.

At the trial it was shown conclusively that Dr. Sloane was the health officer; that he approved in writing the vouchers of the plaintiff for the services performed by her and expenses paid by her, as set forth; that the Governor of the territory also approved the voucher for $155.85 in writing, signing a certificate at the bottom of said voucher reading as follows:

"I, the undersigned, do hereby certify to the correctness of the above account, amounting to $155.85, chargeable to the appropriation for 'emergency fund' for the period ending March 31, 1923. Thomas Riggs, Governor of Alaska."

And that he approved the voucher for $150, signing a certificate at the bottom thereof in all respects similar to the certificate just above quoted, with the exception that the sum mentioned was $150 instead of $155.85; that the Governor then sent said vouchers, so approved by him and by Dr. Sloane, to Sommers, secretary as aforesaid, that the latter might draw a warrant for their payment; that the latter did draw two warrants for the payment of said vouchers, being the warrants heretofore set forth in substance; that on receipt of said warrants said Smith not only refused to register or pay the same, but marked across the face of each one of them in red ink, the word "Canceled," and retained them in his possession, while returning the vouchers to the office of the secretary of the territory, and that up to date he has neither registered nor paid said warrants, or either of them; that

there is now, and was at the time said warrants were drawn, sufficient funds in the treasury to the credit of the emergency appropriation made by the 1921 Legislature to pay said warrants or said vouchers.

H. L. Faulkner, of Juneau, for plaintiff.

John Rustgard, of Juneau, for defendant.

JENNINGS, District Judge. Among the reasons urged by defendant why a peremptory writ of mandamus should not issue are these, to wit:

(1) That no appropriation has been made and there are no funds available out of which the claim of plaintiff could be lawfully paid.

(2) That there is no law enjoining upon him the duty of registering and paying said warrants.

In order to correctly determine the question as to whether the treasurer should be mandamussed to pay the warrants, recourse must be had to the enactments of law.

Chapter 77, Session Laws 1913, p. 297, created the office, prescribed the duties, and fixed the compensation of the treasurer, and made other provisions in reference to the administration of his office.

In Section 7 of said act it was provided that the treasurer:

(a) Shall "receive and safely keep all moneys of the territory."

(b) Shall "disburse public moneys only upon warrant drawn upon the treasurer by such officers as shall hereafter be authorized so to do by law. Such warrants shall be paid by the treasurer * * * from the fund under the proper appropriation."

(d) Shall "pay no moneys or funds out of the treasury except in pursuance of laws authorizing the payment thereof, but whenever any moneys are paid out they shall be paid from the appropriation provided therefor, and from no other fund."

(e) Shall "perform all other duties imposed upon him by law."

In 1919 the Legislature (Laws 1919, c. 35) created the office of commissioner of health of the territory of Alaska, directing that he should be appointed by the Governor for two years and until his successor is appointed, unless sooner removed for cause. That act fixed the compensation of the commissioner of health, defined his power, and prescribed his duties.

Section 3 of that act provides that "the commissioner of health shall have general supervision of the interests of the

6 A.R.—26

health and life of the citizens of the territory." The same section gives him the power and makes it his duty to make and enforce quarantine regulations; to isolate persons affected with any of the diseases mentioned in section 7 of the act; to cause to be removed any dead, decaying, or putrid body, rubbish, garbage, or other substance that may endanger the health of persons or communities; to disinfect houses, rooms, property, places or localities, persons, and other things, whenever deemed necessary to protect or preserve the public health; he is to prepare forms of returns, and such instructions as may be necessary, and to supply the same to assistant commissioners of health, boards of health, etc.; and he is to obtain accurate statistics of the occurrence of contagious and infectious diseases in the territory. In brief, he is given the power, and it is his duty, to do or cause to be done numerous things absolutely essential to the preservation of the health and welfare of the community, nearly all of which things necessitate the incurring of some expense, and the performance of all of which cannot be obtained without clerical and other assistance.

Section 16 of the act provides that—

The "office rent, furniture, traveling expenses, clerical assistance and contingent expenses of the commissioner of public health, and all necessary expenses incurred by any health officer or local board of health in the enforcement of this act shall be paid by the territorial treasurer, as other salaries and expenses in the territory are paid, but all necessary expenses incurred in the enforcement of the provisions of this act by any health officer or local board of health, shall be approved by a board composed of the Governor and the commissioner of health, under rules and regulations to be promulgated by such board."

In view of this section of the act the Legislature of that year made an appropriation as follows:

"For Health and Sanitation

Commissioner of Health, at $1,800 per annum............$3,600.00
\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
Necessary traveling expenses, laboratory, furniture, clerical
　and office expenses...............................$5,000.00."
Laws 1919, p. 111.

No such appropriation was, however, made by the Legislature of 1921. The defendant contends that the fact that

the Legislature of 1921 did not make any appropriation similar to the one last quoted evidences an intention that no such expense shall be incurred, and that at any rate there is no fund from which he can pay for the services of Mrs. Sheelor.

That an appropriation has been made and funds provided from which such expenses can and should be paid for is, I think, so apparent that he who would gravely argue for the truth of that assertion, as if its truth were in doubt, would be liable to invite the criticism, "Thou sayest an undisputed thing in such a solemn way," and yet the "thing" is not "undisputed," for the defendant and his learned counsel seriously contend that there is no appropriation and no fund from which payment can be legally made.

Let us see. It will be noted that the treasurer is to "disburse public moneys only upon warrant drawn upon the treasurer by such officers as shall hereafter be authorized so to do by law." We look through the Session Laws to find what officers have been "hereafter authorized so to do by law," but we look in vain, except that we find that certain appropriations are to be expended under the direction of certain officers referred to in the act making the appropriation. In the appropriation acts we find what is sometimes called "the Governor's emergency fund."

The Legislature of 1915 made appropriations for many specifically named purposes "to be expended under the direction of the Governor," and some appropriations "to be expended under the direction of" other officers or boards; and then, evidently contemplating that it may have overlooked provision for some necessary expense, and intending that services performed for the territory should not go unpaid for, it made an appropriation as follows:

"(p) Emergency Appropriation: For incidental expenses in the territory of Alaska, for purposes not otherwise especially provided for, including employment of legal counsel for enforcement of territorial laws, to be expended under the direction of the Governor, during the period ending March 31, 1917, $30,000.00, or so much thereof as may be necessary." Session Laws 1915, p. 129.

The Legislature of 1917 made appropriations for many specifically named purposes "to be expended under the direction of the Governor," and some appropriations "to be expended under the direction of" other officers or boards, and then, evi-

dently contemplating that it might have overlooked provision for some necessary expense, and intending that services performed for the territory should not go unpaid for, made an appropriation as follows:

"(q) Miscellaneous:

"Emergency appropriations for incidental and other expenses in the territory not otherwise specifically provided for, to be expended under the direction of the Governor, $15,000.00."

Session Laws 1917, p. 200.

The Legislature of 1919 made appropriations for many specifically named purposes "to be expended under the direction of the Governor," and some appropriations "to be expended under the direction of" other officers or boards, and then, evidently contemplating that it might have overlooked provision for some necessary expense, and intending that services performed in carrying out the provisions of the laws of the territory should not go unpaid for, made an appropriation as follows:

"Emergency Appropriation.

"For expenses necessarily incurred in carrying out the provisions of the laws of the territory and not otherwise provided for, to be expended under direction of the Governor, $15,000.00."

Session Laws 1919, p. 114.

The Legislature of 1921 made appropriations for many specifically named purposes "to be expended under the direction of the Governor," and some appropriations "to be expended under the direction of" other officers or boards, and then, evidently contemplating that it might have overlooked provision for some necessary expense, and intending that services performed for the territory should not go unpaid for, made an appropriation as follows:

"Emergency Appropriation.

"For expenses necessarily incurred in carrying out provisions of the laws of the territory and not otherwise provided for, to be expended under direction of the Governor, $15,000.00."

Session Laws 1921, p. 151.

Smith testified that he and the Attorney General were not satisfied that the services, if performed at all, were payable out of the emergency fund, or from the funds of any other appropriation, and that the Attorney General advised him not to

pay the same.  As to that, it may be said that one may search the statutes from beginning to end and he will not find anything therein which constitutes the treasurer or the Attorney General, or either of them, the judges or judge as to whether or not services have been performed which have been vouched for by the approval of the department or officer under whose direction they were said to have been performed (except, of course, in those instances where they are themselves named as the approving officers).  Such duties are not cast upon the treasurer and the Attorney General, and it would be unreasonable to require that they, or either of them, should ascertain the justness or unjustness of the claim of every clerk, stenographer, or other employee of the several departments of activity of this vast territory, or should pass upon the necessity for the purchase of the manifold supplies required in the different departments.  If the Legislature had meant them to have any such power over this fund, it would have used the words "to be expended under the direction of the Attorney General" or "of the treasurer."  On the contrary, it appears that every Legislature since that of the year 1913, so far from intending that the services performed or expenses incurred in carrying out the provisions of the laws of the territory not otherwise provided for should go unpaid, has made a blanket appropriation to take care of such items, and has committed the expenditure of said appropriation, not to the treasurer, not to the Attorney General, but to the highest officer in the territory, the Governor, and by the employing of general language has vested the Governor with the widest discretion, and has not enjoined that the exercise of that discretion should be "with the advice and consent of the treasurer and Attorney General."  The Governor is the judge of the necessity for, and the performance of, work, and of the amount to be allowed therefor, and his approval of vouchers for such unprovided for expenses and his direction to pay out of the emergency fund would be ample protection to the most meticulous of treasurers, and, too, it should go far towards calming the restless anxiety of the Attorney General lest the public funds be illegally expended by others.  If, then, the expenses were not otherwise provided for, and if the Governor has approved the vouchers for such expenditures and ordered the latter paid out of the emergency fund aforesaid, it was clearly the

duty of the treasurer to honor the Governor's direction if there was available cash in said fund.

Now: (1) Was there available cash in the emergency fund? (2) Were the services performed by the plaintiff and the expenses paid by her performed and paid in executing the provisions of some law of the territory? (3) Was payment therefor otherwise provided for?

The defendant admits that there was money in the emergency fund available to take care of these claims. Let us consider, then, questions 2 and 3.

It must be noted that, although the Legislature of 1921 made no specific appropriation to pay for the expenses incurred by the commissioner of health in executing the duties imposed upon him, yet it did not repeal any part of the law which casts upon the health commissioner the duty of executing the provisions of .the act creating his· office. It continued to be the duty of the commissioner of health to do the things which the act provides he shall do, and, if the Legislature has made no specific appropriation to pay for expenses necessarily incurred, how can it be contended that there is no appropriation from which payment for those expenses should be made? The authorization by the Governor of the disbursement of the emergency appropriation is ample authority for the treasurer to "disburse public moneys only upon warrant drawn  *  *  * by such officers as shall hereafter be authorized so to do by law," as provided in subsection "b" of section 7, Laws 1913, p. 300, heretofore referred to. His authority is found in the very language of the said emergency appropriation and in the act prescribing the duties of the commissioner of health and in the nonexistence of any other appropriation. It is true that subsection "b" of section 7, heretofore referred to, provides that the treasurer shall disburse public moneys only upon warrant drawn by the proper officers. A warrant is nothing more nor less than an order; it does not have to be in any particular form; it does not have to be in the shape of a negotiable instrument. The object of requiring a warrant is not to confer a benefit upon the holder of a claim, but it is that a check may be had upon the treasurer and to serve the purpose of evidence readily obtainable that the provisions of the law have been complied with; that is to say, that the treas-

urer has not paid money except upon the order of the person charged with its expenditure.

The vouchers bearing the approval of Dr. Sloane, the health commissioner, and of Gov. Riggs, and the latter's direction that they are to be ·paid out of the emergency fund, were the property of Mrs. Sheelor, and if she had taken to defendant those vouchers so approved and bearing said direction for payment and herself demanded payment, there would have been no excuse for his not paying them; but that is not what was done, and the trouble in this case is this: The propriety of the issuance of the mandamus asked for depends upon the answer to the question as to whether or not it is the duty of Smith to pay these particular warrants—not to pay [Mrs. Sheelor's claim, not to pay the vouchers that Gov. Riggs has signed, but to pay two particular warrants signed by R. J. Sommers, secretary of the territory, asked for by plaintiff. As there must be some law enjoining the performance of the duty alleged before a mandamus can be issued to secure the performance of that duty, the question naturally arises: What law gives R. J. Sommers, secretary of the territory, the right by his warrants to command Smith to pay any sum out of the appropriation in question? What has the secretary of the territory to do with this claim? Manifestly he has nothing to do with it so far as the law is concerned.

Counsel for plaintiff contends that the evidence showed that in all cases of claims against the territory it has been the custom for many years for the claimant to present vouchers for his claim, whether it be for services or expenses incurred, to the officer under whose direction said services were performed or expenses incurred, and that upon his approval same were sent by him to the secretary of the territory, that the latter might draw a warrant for the payment of the same, and that said warrant so to be drawn might be sent by the secretary of the territory to the treasurer for registration and for countersignature by the last-named officer, and that, when so countersigned, they might then be sent by the treasurer to the payee, who would· thus be enabled to handle them as if they were negotiable or bankable paper. The evidence undoubtedly shows that that has been the customary way of handling claims against the territory, but there is no positive law pre-

scribing that method, and it was adopted simply as a matter of convenience and as affording a check, or supposed check, upon the officers. No plausible reason is apparent why that custom and method was not adhered to in this particular case. However that may be, yet the system usually employed was not enjoined by law, and, not being enjoined by law, might be changed at any time, for better or for worse, without laying the officers liable for nonperformance of a duty imposed by law. Mandamus will not lie to secure adherence to a custom.

I feel that the plaintiff has been unfairly discriminated against in the matter of her claim. That she earned her money there seems to be no doubt. In order to get out of the treasury of the territory the money that is due her, she has pursued the course ordinarily pursued in like cases. She has been compelled to resort to the expense and annoyance of a lawsuit to obtain compensation for services rendered to the territory of Alaska in connection with the execution of its laws. It is possible that she may be forced to bring a suit against the treasurer on his official bond in order to obtain what is rightfully hers. It would be a shame if she should be compelled to this necessity, but, notwithstanding that, I do think as a matter of fact that this is not a proper case for a mandamus under the pleadings and the evidence; as mandamus is an extraordinary remedy justified only when the duty sought to be commanded is clearly enjoined by law, and the refusal to perform that duty is clearly shown, and there is no other plain, speedy, and adequate remedy.

The petition for the peremptory writ of mandamus will have to be denied.

---

⬉See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes